## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Application of<br><br>Cheyne European Strategic Value Credit RAIF-Cheyne European Special Situations Fund,<br><br>Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding | Case No. 25- |

## DECLARATION OF GIJS BERKHOUT IN SUPPORT OF THE APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

I, Gijs Berkhout, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct.

1.     I am an attorney licensed to practice law in the Netherlands since 2012.  I am a partner at Lemstra Van der Korst, a corporate and commercial litigation and arbitration firm based in Amsterdam.  My practice focuses on litigation, including on behalf of companies, their directors and shareholders in various disputes concerning, among other things, company takeovers, directors' and supervisors' liability, and shareholder disputes.  I am a member of the Association of Corporate Litigation ('Vereniging Corporate Litigation') and the Dutch Association of Insolvency Practitioners ('INSOLAD').  I also teach and publish on corporate law and insolvency law.

2.     I am counsel to Cheyne European Strategic Value Credit RAIF-Cheyne European Special Situations Fund ("Petitioner") and other members of an ad hoc group of Noteholders of the Senior Secured 9% Notes due 2027 (the "Notes") issued by Hunkemöller International B.V. (the "Company").  Petitioner and the ad hoc group (the "AHG") retained me in connection with litigation to be filed in the District Court of Amsterdam, as set out below (the "Dutch Proceeding").

3.      I make this declaration in support of the application filed by Petitioner under 28 U.S.C. § 1782 seeking certain documentary evidence and testimony from Redwood Capital Management, LLC ("Redwood" or "Respondent") for use in litigation arising out of the misconduct of the Company, its (former) parent companies Shero Midco B.V. ("Midco") and Shero Holdco B.V. ("Holdco", together the "Companies"), its directors W.G.H. van Engelen, Mr. N.J. Gresham and Mr. B. Grevy (the "Directors"), and the Security Agent, including the Dutch Proceeding and a related U.K. Proceeding (the "Application").[1]

## I.      THE DUTCH PROCEEDING

### A.      Factual Background

#### 1.      The Company and its financing Structure as per 2022

4.      The Company operates as a Dutch retail business engaged in the production and sale of lingerie. Founded in 1886, the Company currently has over 700 stores in more than 20 countries, including the Netherlands, Germany, Belgium, Egypt, and Saudi Arabia. It also maintains an online presence in various countries. The Company has its registered office in Amsterdam and its headquarters in Hilversum.

5.      Until recently, Midco held all shares in the Company, while Holdco held all shares in Midco. The shares in Holdco are (or were) held by, among others, private equity investors Parcom Capital Management, Opportunity Partners, and The Carlyle Group.

6.      In 2022, The Company entered into various financing arrangements.

---

[1] The U.K. Proceeding is described in an accompanying declaration of Fiona Huntriss, U.K. counsel to the AHG.

7.     Firstly, in June 2022, the Company entered into a revolving credit facility (the "RCF") with various Dutch and foreign banks (the "RCF Lenders"). The limit under the RCF was set at EUR 50 million, which the Company drew in full.

8.     Secondly, also in June 2022, the Company entered into a bridge loan facility (the "Bridge Loan") with various Dutch and foreign banks (the "Bridge Lenders"). The Bridge Loan was initially granted for a nominal amount of EUR 340 million. The Company subsequently applied the proceeds of the issuance of the Notes (see below) towards (partial) repayment of the Bridge Loan, resulting in an outstanding nominal amount of EUR 67.5 million as of 31 October 2022.

9.     Thirdly, on 31 October 2022, The Company issued the Notes for a nominal amount of EUR 272,500,000. The Notes were taken up by financiers who can be grouped into the following three categories (collectively, the "Holders"):

i)   Redwood subscribed to Notes for a nominal amount of EUR 186,075,000 (approximately 68% of the Notes);

ii)  The AHG subscribed to Notes for a nominal amount of EUR 84,325,000 (approximately 31% of the Notes);

iii) The remaining Notes, for a nominal amount of EUR 2,100,000 (approximately 1% of the Notes), were taken up by other parties.

2.     The Company in financial distress

10.    In 2023, the Company generated insufficient profits to meet its liquidity needs.

11.    In November 2023, credit rating agency S&P downgraded the Notes from "B-" to "CCC+", citing the risk of further downgrades if the financial situation failed to stabilize. According to S&P, the Company faced "*weak demand prospects in core markets, persistent wage*

3

*cost inflation, and margin pressure due to high operational leverage.*"  Simultaneously, the Company was developing a new distribution center, the costs of which burdened capital expenditures.  The center was not expected to become profitable until 2025.  S&P warned that the long-term capital structure would become "*unsustainable*" if operational performance did not improve.

12.    On 17 January 2024, credit rating agency Moody's downgraded the Company's rating from "B3" to "Caa1".  Moody's attributed this to "*weak trading results*" in 2023, negative free cash flows, and a weak liquidity profile.  It noted "*low in-store traffic and subdued customer demand,*" leading the Company to close thirty stores in 2023, with dozens more closures anticipated in 2024.

13.    The deteriorating business performance directly impacted the Company's liquidity position.  In the first nine months of 2023, the Company reported a negative cash flow of EUR 18.9 million.  By the end of October 2023, it held only EUR 5 million in available cash. At that point, the Company could draw a remaining EUR 27 million under its RCF.  In November 2023, it was compelled to draw an additional EUR 12 million under the RCF to meet the semi-annual interest payment on the Notes.

14.    As of 31 January 2024, the Company held less than EUR 3 million in its bank accounts. By April 2024, the credit facility was fully drawn.  There was insufficient cash available to continue operations.

15.    I understand that, during that time, members of the AHG made several attempts to engage with the Company and offer assistance, but the Company refused, despite the dire situation.

### 3.    The 2024 Up-Tiering Transaction

16.    To their surprise, on 13 June 2024 the AHG was informed of an up-tiering of Redwood's Notes by the Company (the "Up-Tiering").  While the AHG was actively seeking to support the Company, the Company and Redwood secretly colluded to devise, prepare, and execute the Up-Tiering.  In exchange, Redwood provided additional financing to the Company in a so-called *quid pro quo* arrangement.

17.    The Up-Tiering was implemented through a series of steps, all carried out in secret.

18.    First, on 12 April 2024, the Company and Redwood jointly removed Article 4.18 of the Indenture (the "Anti-Collusion Provision"), which prohibited the Company from selectively offering a consideration to certain Holders in exchange for their consent to amend the Indenture. In essence, the Anti-Collusion Provision barred the Company from colluding with a subset of Holders against the rest.  Its deletion allegedly cleared the way for further amendments to the Indenture.

19.    Second, on 7 June 2024, the Company entered into a term loan credit facility with, inter alia, Redwood (the "Redwood TLCF").  This facility, amounting to EUR 50 million, was structured to take payment priority over the Holders' Notes and constituted the *quid* in the *quid pro quo*.

20.    Third, by entering into the Redwood TLCF, the Company and Redwood faced a constraint: only EUR 25 million in remaining capacity was available under the Indenture for additional credit facilities.  Concluding a EUR 50 million facility therefore constituted a breach. The solution devised by the Company and Redwood was to further amend the Indenture.  By Supplemental Indenture No. 3 dated 10 June 2024, Section 4.01(b) was amended to increase the limit from EUR 75 million to EUR 100 million.

21.     Fourth, on 10 June 2024, Redwood's Notes were cancelled and, simultaneously, new notes (the "Up-Tiered Notes") were issued to Redwood in the same aggregate principal amount of EUR 186,075,000, represented by a new global note with ISIN of XS2841266294.

22.     Fifth, the Indenture Waterfall (Article 6.10 of the Indenture) was amended by Supplemental Indenture No. 4, also dated 10 June 2024.  Among other changes, this amendment granted the Up-Tiered Notes priority rights to payment over the remaining Notes with respect to any proceeds.  This constituted the *quo* in the *quid pro quo* and marked the completion of the Up-Tiering.

23.     The Up-Tiering was designed to unlawfully prejudice the AHG, as the remaining Notes were purportedly subordinated to Redwood's Up-Tiered Notes, whereas previously all Notes ranked *pari passu*.  The Company made no effort to contact or inform the AHG prior to the purported enactment of the Up-Tiering. The AHG only became aware of the Up-Tiering through the notice dated 13 June 2024, referenced above.  Following this discovery, the AHG made multiple attempts throughout the summer of 2024 to engage with the Company and discuss reversing the Up-Tiering. When the Company refused, the AHG initiated legal proceedings against the Company in New York, as detailed in the Complaint filed with the New York Supreme Court, Commercial Division, and attached to the accompanying Declaration of Duane L. Loft (the "New York Proceeding").

        4.     The 2025 Transactions

24.     During its Q3 earnings call on 22 January 2025, the Company again expressed serious concerns regarding its liquidity position, noting that it was working with advisors to address the situation. In response, the AHG repeatedly sought to engage with the Company and its stakeholders to initiate a constructive dialogue on how it could support efforts to resolve these

financial challenges. However, to the AHG's disappointment, the Company and its stakeholders, including the Directors, consistently refused to engage, leaving key financial issues unresolved.

25.     By letter dated 10 March 2025, the AHG (through its legal counsel) once again emphasized to the Directors the urgent need for dialogue.  In response, by letter dated 12 March 2025, the Directors (through their legal counsel) explicitly stated that they did not consider contact with the AHG to be necessary or constructive.

26.     It ultimately became clear that, throughout this period, the Directors, acting through Holdco, had once again been secretly pursuing an unlawful scheme.  They conceived, prepared, and executed a series of transactions – purportedly under the Intercreditor Agreement dated 24 June 2022 (the "ICA") – with the aim of expropriating the AHG's Notes.

27.     First, in February 2025, Redwood partially or wholly acquired the debt positions of the RCF Lenders and the Bridge Lenders.  This acquisition granted Redwood substantial additional influence over the Company, including the ability to independently initiate certain actions, such as issuing enforcement instructions to the Security Agent as an Instructing Group (see below).

28.     Second, on 20 February 2025, at the Company's instruction, two Luxembourg entities were incorporated: Hunkemöller Holding S.à r.l. ("Luxco 1") and HKM Holding S.à r.l. ("Luxco 2", and together with Luxco 1, the "Luxcos").  The entity that incorporated the Luxcos, acting on behalf of the Company, appears to have been an entity controlled by Vistra, a trust services provider with a significant presence in Luxembourg. On 21 February 2025, the day after their incorporation, Holdco acquired all shares in Luxco 1 and, indirectly, in Luxco 2, following a transfer of Luxco 2's shares to Luxco 1 – thereby inserting the Luxcos into the Company's corporate structure.  Below is a corporate structure diagram illustrating the Company's holding structure before and after the incorporation of the two newly formed Luxcos:

**On 20 February 2025**



**On 21 February 2025**



29.    This restructuring paved the way for the transactions described below.

30.    Third, on 11 March 2025, Luxco 1 granted a pledge over the shares in Luxco 2 (the "Luxco 2 Share Pledge") in favour of TMF Trustee Limited, acting as Security Agent under the ICA.  On the same day, Holdco transferred the shares in Midco – and thereby, indirectly, the shares in the Company, its subsidiaries, and other participations – to Luxco 2. As a result, it became

possible to transfer the entire Company group to a third party via enforcement of the Luxco 2 Share Pledge – a possibility that did not exist before 11 March 2025.

31.     Fourth, on 21 March 2025, relying on what appears to be a manufactured event of default, a purported Instructing Group (as defined in the ICA) allegedly instructed the Security Agent to enforce the Luxco 2 Share Pledge.  The Security Agent obtained a so-called valuation report that allegedly indicated a negative valuation of the Company's group on an accelerated M&A basis, and a market value of nil for the Luxco 2 shares.

32.     Based on the purported Event of Default and the 'valuation report', the Luxco 2 Share Pledge was enforced – just ten  days after it had been established – and all shares in Luxco 2 were transferred to Purple Iris, LP, an entity controlled by Redwood, for a payment of EUR 0.

33.     Simultaneously, the RCF, the Redwood TLCF, the Bridge Loan and the Notes were transferred to the same entity for a payment of EUR 86,700,000 – an amount insufficient to allocate any proceeds to the Holders, as the Indenture required that the RCF and Redwood TLCF (totalling EUR 100 million) be paid in priority.

34.     Only after the completion of all these steps did the Company (through its legal counsel) inform the AHG by letter – still on 21 March 2025 – of the 2025 Transactions. The Company presented the 2025 Transactions as a fait accompli.  Brazenly, the Company proposed to discontinue the New York Proceeding, stating that it had become moot since all Holders, regardless of ranking, were out-of-the-money.  In response, by letter dated 26 March 2025, the AHG informed the Company that it did not consider the 2025 Transactions legally valid and requested full disclosure of all relevant information and documents, including details of the alleged event of default and the valuation report.  By letter dated 28 March 2025, the Company refused to comply with these requests.

35.     As a result of these transactions, Redwood was able to seize the Company and its affiliated entities at a significant discount to their true value, outside the framework of the relevant debt documents and to the detriment of other creditors, including the AHG.

**B.    Legal Basis for Dutch Claims**

36.     The AHG intends to file suit against both Holdco and the Directors before the District Court of Amsterdam, alleging tort claims arising from the actions described above (the "Statement of Claim").

37.     Pursuant to Article 6:162 of the Dutch Civil Code (*Burgerlijk Wetboek,* "DCC"), a tortious act may be established in the event of (i) a violation of a right, (ii) an act or omission in breach of a duty imposed by law or (iii) an act or omission in breach of a rule of unwritten law relating to proper conduct.[2]   Under Dutch law, it is tortious to fail to exercise due care towards others in relation to their person or property.  For a duty to pay damages to arise, the tortious act must be attributable and must have caused loss.  Attribution is possible if the act results from their fault or a cause for which they are legally or socially responsible.

---

[2] Article 6:162 DCC states: "*1. A person who commits a tort against another which is attributable to him, must compensate any consequential loss suffered by the other. 2. Except where there are grounds for justification, the following are considered as torts: the violation of a right and an act or omission breaching a duty imposed by law or a rule of unwritten law relating to proper social conduct. 3. A tort is attributable to a tortfeasor if it is due to his fault or to a cause for which he is responsible at law or pursuant to generally accepted principles.*" (unofficial English translation); "*1. Hij die jegens een ander een onrechtmatige daad pleegt, welke hem kan worden toegerekend, is verplicht de schade die de ander dientengevolge lijdt, te vergoeden. 2. Als onrechtmatige daad worden aangemerkt een inbreuk op een recht en een doen of nalaten in strijd met een wettelijke plicht of met hetgeen volgens ongeschreven recht in het maatschappelijk verkeer betaamt, een en ander behoudens de aanwezigheid van een rechtvaardigingsgrond. 3. Een onrechtmatige daad kan aan de dader worden toegerekend, indien zij te wijten is aan zijn schuld of aan een oorzaak welke krachtens de wet of de in het verkeer geldende opvattingen voor zijn rekening komt.*" (original Dutch version).

38.     In the context of directors' liability, Dutch case law requires that, in addition to the general tort conditions under article 6:162 DCC, the director must be seriously personally culpable (*persoonlijk ernstig verwijt*).    This means that the director's conduct must be sufficiently blameworthy and go beyond ordinary negligence to justify personal liability.    This standard has been established by the Dutch Supreme Court, notably in the *Ontvanger / Roelofsen* judgment.[3]

39.     In 2024, the Directors, acting on behalf of the Company and in coordination with, inter alia, Redwood, conceived, prepared and executed the Up-Tiering.    The purpose of the Up-Tiering was to ensure that Redwood would obtain a higher ranking than the AHG under the Indenture, in exchange for providing additional financing to the Company.    The intended effect was to benefit the Company and Redwood, while disadvantaging the AHG.

40.     In 2025, the Directors, acting on behalf of the Company, Midco and Holdco, and in collaboration with, among others, Redwood, conceived, prepared and executed the 2025 Transactions. The aim was the complete expropriation of the AHG in order to unilaterally eliminate the Company's debt obligations towards the AHG and thereby terminate the New York Proceeding. As a result, Redwood acquired control over the Company's group at a nominal price.    The intended effect was to benefit the Company, its shareholders, and Redwood, while disadvantaging the AHG.

41.     Given, inter alia, the severity and deliberate nature of the actions taken, the systematic exclusion of the AHG – thus precluding realistic and less harmful alternatives – the intentional concealment of those actions (which persists to this day), and the unmistakably prejudicial effect of causing unnecessary and disproportionate harm to the AHG, the AHG will allege that Holdco and the Directors have acted unlawfully, warranting serious personal culpability,

---

[3] Dutch Supreme Court 8 December 2006, ECLI:NL:HR:2006:AZ0758, *NJ* 2006/659, para. 3.5. A true and correct copy of that decision is attached hereto as **Exhibit B**.

towards the AHG.  These actions are attributable to them, and they are liable for the damages the AHG has suffered and will continue to suffer.  In my view, the AHG may argue that these losses include the diminished value of their Notes.

42.    For the avoidance of doubt, the AHG notes that the Dutch court has jurisdiction over claims against Holdco and the Directors. Pursuant to Article 4 (1) of the Brussels I-bis Regulation, jurisdiction lies with the court of the defendant's domicile.  Furthermore, under Article 8 (1) of the Brussels I-bis Regulation, where multiple defendants are sued, a person domiciled in a Member State may also be sued in the courts of the place where any of the defendants is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings.

43.    Holdco and the directors W.G.H. van Engelen and N.J. Gresham are currently domiciled in the Netherlands.  Accordingly, the Dutch court has international jurisdiction over them under Article 4 (1) of the Brussels I-bis Regulation.  Although director B. Grevy is domiciled in Sweden, the Dutch court also has international jurisdiction over him pursuant to Article 8 (1) of the Brussels I-bis Regulation, as the claims against the defendants are sufficiently similar that joint handling is required to ensure sound administration of justice and to avoid the risk of irreconcilable judgments in separate proceedings.

C.    **The Dutch Pre-Suit Discovery**

44.    Before the Statement of Claim is filed with the Amsterdam District Court, the AHG has requested additional information regarding the events of 2024 and 2025 from the prospective defendants.  On 23 April 2025, I sent a pre-suit discovery request on behalf of the AHG to counsel for the Directors and the Companies, pursuant to Article 194 DCC.  The letter is attached hereto as **Exhibit A**.

45.     If counsel, on behalf of the Companies and the Directors counsel, refuse to disclose any documents, the AHG will be compelled to initiate pre-litigation discovery proceedings before the court pursuant to Article 196 DCC and intends to do so if necessary.

46.     The Dutch pre-litigation discovery proceedings have recently been reformed significantly.  Under the previous legal regime, various types of preliminary evidentiary measures — such as witness examinations, expert opinions, and requests for document disclosure — were governed by separate provisions, each with its own procedural nuances, applicable standards and lead time.  The new regime consolidates these into a single procedure governed by Article 196 of the Dutch Code of Civil Procedure (the "DCCP").  Regardless of the form the measure takes, all requests are now assessed under the same legal standard, aiming to simplify access to information and strengthen fact-finding in civil proceedings. Generally speaking, the lead time of these proceedings is expected to be between three to five months.

47.     One of the central features of the reformed procedure is the introduction of a uniform and relatively lenient standard for assessing requests.  Article 196 of the Dutch Code of Civil Procedure now provides that the court must allow a request for preliminary evidentiary measures, unless specific grounds for refusal apply.  This reversal of the burden — from having to justify why evidence should be obtained to justifying why it should *not* — marks a clear shift in favor of access to information at an early stage of the dispute.  This is also reflected in the codification of the possibility to obtain evidence from third parties in pre-litigation proceedings.

48.     The AHG's pre-litigation discovery request seeks that the Companies and its Directors provide a list of documents and information, attached as Exhibit A, and generally includes documents related to the Up-Tiering and the 2025 Transactions.

14

49.     In addition, the AHG requests to hear the Directors as witnesses on the facts stated above.

50.     Given the lower threshold under the new regime and the facts set out above, I am of the opinion that the AHG is likely to successfully argue that it is entitled to the requested documents and the hearing of the witnesses.  Consequently, the Dutch court is likely to grant the discovery requests.

51.     After the pre-litigation discovery proceedings are complete, the AHG will file the Statement of Claim with the District Court of Amsterdam.  The AHG is actively drafting and compiling the Statement of Claim and pre-action correspondence to allow for prompt action following the completion of the pre-litigation discovery proceedings.  The AHG does not intend to name Redwood as a party to the Dutch Proceeding.

## II.    DISCOVERY IN THE DUTCH PROCEEDING

### A.    Receptivity of Dutch Courts to Evidence Obtained Through Section 1782

52.     Under Article 152(1) of the DCCP, parties have the right to submit evidence in any form unless expressly prohibited by law.  This right has been affirmed by the Dutch Supreme Court.[4]  There are no Dutch laws prohibiting the use of evidence collected under the 1782 Application.  Nor are there any general Dutch rules of discovery, privilege, or otherwise, that would prevent the AHG from obtaining or relying on the evidence sought through Section 1782.

53.     To the contrary, Dutch courts have held that evidence collected through a 1782 Application may be used in Dutch proceedings.  In *Convex c.s. v. Duizendstraal c.s.*, the District Court of Utrecht rejected a party's objections to the use of evidence collected pursuant to a Section 1782 Application and held that parties are free to use an 'informal judicial method' outside of the

---

[4] Dutch Supreme Court 18 April 2014, ECLI:NL:HR:2014:942, para. 5.2.3.

Dutch courts to collect evidence.[5]  A true and correct copy of that decision is attached hereto as **Exhibit C**.  The District Court found that the Section 1782 Application was such an 'informal' method and could be invoked without the intervention of the Dutch courts.  Accordingly, the District Court admitted documents and the written transcripts of depositions obtained pursuant to the Section 1782 Application.  The decision of the District Court was affirmed in appeal.[6]  Various authors have confirmed this understanding that evidence obtained through Section 1782 discovery can subsequently be used in Dutch civil proceedings.[7]

**B.      Relevance of Requested Discovery to Dutch Proceedings**

54.      I have reviewed the categories of discovery Petitioner requests through the Application (the "Requested Discovery").

55.      The Requested Discovery is likely relevant to the issues in the Dutch Proceedings, as it substantiates the directors' unlawful conduct and the resulting damages. For example, the details of the alleged event of default clarify whether enforcement was indeed permissible; the specifics of the Luxco 2 Share Pledge reveal the purpose of the pledge; the contents of the valuation report indicate the damage suffered by the AHG; and the related correspondence sheds light on whether there was malicious intent.

---

[5] District Court Utrecht 9 April 1996, KG 1996/158 (*Convex c.s. / Duizendstraal c.s.*); District Court Rotterdam 8 August 2012, ECLI:NL:RBROT:2012:BX4521.

[6] Court of Appeal Amsterdam 24 October 1996, NIPR 1999/120.

[7] K.J. Krzemenski, *U.S. discovery for use in Dutch civil proceedings*, TvCR 2008/2; J.J.H. Joosten & J.C. Tijink, *'Gedagvaard in de VS: discovery'*, TOP 2017/235.

Executed in Amsterdam, the Netherlands, this 23rd day of April, 2025.

Gijs Berkhout