# EXHIBIT A

# LEMSTRA VAN DER KORST

**REGISTERED MAIL**
PER EMAIL

Allen Overy Shearman Sterling LLP
Attn: Mrs. S. Jansen
Apollolaan 15
1077 AB AMSTERDAM
NETHERLANDS

Email: sigrid.jansen@aoshearman.com

G.C. Berkhout
Attorney-at-law

T. M. Alberga-Smits
Attorney-at-law

Prins Hendriklaan 16, 1075 BC Amsterdam
P.O. Box 75655, 1070 AR Amsterdam

tel.:   +31 (0)20 20 50 571
mob.:  +31 (0)61 04 40 247

mail:  g.berkhout@lvdk.com
mail:  t.alberga@lvdk.com
web:   www.lvdk.com

| | |
|---|---|
| Re | Notice of liability and request for documents |
| Ref | 5626 |
| Date | 23 April 2025 |
| Place | Amsterdam |

Dear Colleague,

We write on behalf of our clients, the Ad Hoc Group (the "AHG") of Noteholders of the Senior Secured 9% Notes due 2027 (the "Notes", and holders of Notes: "Holders"), issued by Hunkemöller International B.V. (the "Company") and governed by an indenture dated 31 October 2022 (the "Indenture"). The members of the AHG are listed in <u>Annex 1</u> to our letter dated 10 March 2025.

We address this letter to you in your capacity as counsel to (a) Shero Holdco B.V. ("Holdco"), (b) Shero Midco B.V. ("Midco"), (c) the Company (together with Holdco and Midco: the "Companies") and (d) Mr. W.G.H. van Engelen, Mr. N.J. Gresham and Mr. B. Grevy, each in his capacity as statutory director of each of the Companies (the "Directors").

Below, we outline how, among others, the Companies and the Directors have acted unlawfully toward the AHG and the other minority Holders. On behalf of the AHG, we expressly reserve all rights to pursue claims against the Companies and the Directors. In addition, we request that they provide certain information and documents.

**Facts**
The AHG was informed about an up-tiering of a part of the Notes by the Company (the "Up-Tiering") through a notice dated 13 June 2024. The Up-Tiering was implemented through the execution of certain juridical acts, including but not limited to: (a) the cancellation and delisting of EUR 186,075,000 in existing Notes beneficially owned by funds managed by Redwood Capital Management, LLC (together, "Redwood"), (b) the issuance by the Company of new notes to Redwood, in an aggregate principal amount of EUR

Lemstra Van der Korst N.V. has its registered office in Amsterdam. Lemstra Van der Korst's general terms and conditions, which stipulate a limitation of liability, are applicable to all work performed and are filed with the Amsterdam Chamber of Commerce (File nr. 50955829). A copy of the general terms and conditions is available on request or at www.lvdk.com.



186,075,000, represented by a new global note with ISIN of XS2841266294 (the "Up-Tiered Notes"), and (c) the execution of a supplemental indenture no. 4 on or about 10 June 2024, which purported to amend the Indenture in various ways, including to grant the Up-Tiered Notes a priority right of payment relative to the remaining Notes with respect to any proceeds of enforcement.

The Up-Tiering was designed to unlawfully prejudice the AHG and the other minority Holders, as the remaining Notes were purportedly subordinated to Redwood's Up-Tiered Notes, whereas previously, all Notes ranked *pari passu*. The Company rebuffed the AHG's outreach that sought to open discussions around alternative financing solutions, and instead concealed the Up-Tiering and its negotiations from the AHG until its purported enactment. The AHG only became aware of the Up-Tiering through the notice dated 13 June 2024, referenced above. Upon this discovery, the AHG made multiple attempts throughout the summer of 2024 to engage with the Company and discuss the unwinding of the Up-Tiering. As the Company again refused to engage, the AHG had no choice but to initiate the U.S. legal action known to the Company as *Cheyne European Strategic Value Credit RAIF-Cheyne European Special Situations Fund v. Hunkemöller International BV*, Index No. 659297/2024 (N.Y. Sup. Ct.). In subsequent correspondence dated 3 March 2025, the AHG conveyed to the Company that the AHG considers the relevant juridical acts null and void under the Dutch Civil Code (which does not make the relevant Notes documentation less untenable), and, to the extent they were not already null and void, annulled the relevant juridical acts.

On its Q3 earnings call on 22 January 2025, the Company disclosed that it was working with advisors in connection with its liquidity situation. In light of this, the AHG once again repeatedly sought to engage with the Company and its stakeholders to initiate a constructive dialogue on how it could be supportive in addressing these financial challenges. To the AHG's disappointment, the Company and its stakeholders consistently declined to engage, leaving critical financial issues unaddressed. In a letter dated 10 March 2025, sent to you for the benefit of the Directors, we emphasized on behalf of the AHG the urgent need for immediate engagement to prevent the Company from causing further harm to the AHG. In your response letter dated 12 March 2025, you informed the AHG, through us, that the Directors did not consider further engagement with the AHG to be necessary or constructive. Despite the AHG's repeated attempts, the Company and the Directors continued to exclude the AHG and withhold all relevant information from its members.

In a final and most alarming development, it ultimately became apparent that the Companies and the Directors had, throughout this entire period, once again been secretly pursuing an unlawful scheme. They conceived, prepared,

2



and executed a series of transactions – purportedly under the Intercreditor Agreement dated 24 June 2022 (the "ICA") – with the aim of expropriating the value of the AHG's Notes (the "Expropriation").

On 20 February 2025, two Luxembourg companies, Hunkemöller Holding S.à r.l. ("Luxco 1") and HKM Holding S.à r.l. ("Luxco 2", and together with Luxco 1, the "Luxcos"), were incorporated. On 21 February 2025, Holdco became the sole shareholder of Luxco 1 and, indirectly, of Luxco 2, as the shares in Luxco 2 were transferred to Luxco 1. On 11 March 2025, Luxco 1 granted a share pledge over its shares in Luxco 2 ("Luxco 2 Share Pledge") for the benefit of the Security Agent under the ICA, TMF Trustee Limited (the "Security Agent"). That same day, the Luxcos were inserted into the Hunkemöller holding structure by a transfer of the shares in Midco to Luxco 2.

On 21 March 2025, relying on what appears at this stage to be a manufactured event of default, a purported Instructing Group (as defined under the ICA) supposedly instructed the Security Agent to enforce the Luxco 2 Share Pledge. The Security Agent obtained a so-called valuation report which allegedly indicated a negative valuation of the Hunkemöller group on an accelerated M&A basis and a market value of the Luxco 2 shares of nil. On the basis of the purported event of default and the 'valuation report', the Luxco 2 Share Pledge was enforced (only 10 days after being granted), and all shares in Luxco 2 were transferred to Purple Iris, LP – an entity controlled by Redwood – in exchange for a payment of EUR 0. At the same time, still on 21 March 2025, all secured liabilities subject to the ICA, including all Notes liabilities, were transferred to the same entity for a payment of EUR 86,700,000, an amount insufficient to pay out any amount to the senior secured class of the Company's creditors, including the AHG, if the proceeds are applied pursuant to the waterfall in the ICA ("Liabilities Disposal").

It was only upon completion of all the aforementioned steps that, by letter dated 21 March 2025 (close of business), the Company informed the AHG of these developments as a fait accompli. Brazenly, the Company proposed discontinuing the U.S. legal action referenced above, arguing that the matter had become moot as a result of the unlawful scheme orchestrated and executed by the Company, the Directors and their accomplices. In response, by letter dated 26 March 2025, the AHG informed the Company that it does not regard the transactions carried out pursuant to the unlawful scheme as legally valid or effective.

In correspondence dated 26 March 2025, the AHG also requested the Company to provide relevant information and documentation, including materials relating to the purported event of default and the accelerated M&A basis valuation of the Hunkemöller group. By letter dated 28 March 2025 and in line

3



with its previous stance, the Company once again declined to disclose any information. To date, the identities of the Instructing Group, the reasons for the insertion of Luxco 1 and Luxco 2 into the corporate structure, the details of the purported event of default, the valuation report, and all other information and documents necessary for a proper verification of the course of events have not been made available to the AHG, despite the AHG having made multiple requests for disclosure.

**Liability**

The engineering and execution of the unlawful schemes described above constitute an unlawful action by the involved parties and results in their liability to the AHG. Such includes the Directors. Under Dutch law, a statutory director of a company is liable to a third-party creditor under Article 6:162 of the Dutch Civil Code in the case when the director has acted in a manner that warrants serious personal culpability.

Given, *inter alia*, the severity and deliberate nature of the actions taken, the systematic exclusion of the AHG – thereby foreclosing real and less harmful alternatives to the chosen course – the intentional concealment of those actions (which continues to this day), and the unmistakably prejudicial effect of causing unnecessary and disproportionate harm to the AHG, the Directors acted in a manner warranting serious personal culpability.

On behalf of the AHG, we request that the Companies and the Directors, no later than close of business on 7 May 2025, confirm their liability to the AHG for all losses incurred by the AHG as a result of the facts set forth above. On behalf of the AHG, we explicitly reserve all claims the AHG may have against the Companies and the Directors in connection with the facts set forth above within the meaning of Article 3:317(1) of the Dutch Civil Code.

The Companies' and the Directors' conduct also raise concerns as to whether there has been proper consideration toward compliance with all regulatory and other obligations, including taking into account those arising as a result of the listing of the Notes. The AHG reserves its rights fully.

**Request for documents**

The AHG wishes to receive certain documents from the Companies and/or the Directors (together "You" or "Your") in order to further substantiate its claims against You and to further determine its legal position. On behalf of the AHG, we request that You provide the documents set forth in Schedule 1 to this letter by no later than close of business on 7 May 2025. The list of documents requested is not exhaustive, and the AHG reserves all rights to seek further documents as they are able to learn more about the relevant events. If the requested documents are not provided timely, the AHG will ask



5

the Dutch court to order disclosure of as part of pre-litigation discovery proceedings on the basis of Section 196 et seq. of the Dutch Code of Civil Procedure that the AHG is contemplating. Please note that the AHG expects that You will preserve all disclosable documents and will consider it unlawful if You cause the deletion or disappearance thereof.

Sincerely yours,
Lemstra Van der Korst N.V.

G.C. Berkhout                                T.M. Alberga-Smits



**SCHEDULE 1 – DOCUMENTS**

**Up-Tiering**

*Unless otherwise specified in an individual request, the requests related to the Up-Tiering seek documents created, sent or received during the period 1 February 2024 through to 30 June 2024.*

1. All documents relating to Your attempts to obtain new financing for the Company during the first half of 2024;

2. All documents relating to the negotiation and execution of the Up-Tiering, including but not limited to documents relating to:

    a. Your consideration of alternatives to the Up-Tiering;

    b. Your communications with Redwood and/or other Holders in relation to the Up-Tiering;

    c. Your communications with BNY Mellon Corporate Trustee Services Limited (the "Trustee") in relation to the Up-Tiering;

    d. Non-privileged communications with any advisors in connection with the Up-Tiering;

    e. Amendment of Section 4.18 of the Indenture;

    f. Super Senior Term Loan, including the Super Senior Credit Agreement entered into with Redwood and possible other financiers on 7 June 2024;

    g. Amendment of Section 4.01(b) of the Indenture;

    h. Cancellation of any of the existing Notes, issued under the 2022 Global Notes;

    i. Issuance of the Up-Tiered Notes;

    j. Amendment of Section 6.10 of the Indenture;

    k. Section 6.03 of the Indenture;

    l. Section 6.06 of the Indenture;

    m. Redwood's alleged authorization from the registered Holder to take action under the Indenture in respect of Notes or Up-Tiered Notes beneficially owned by Redwood or its affiliates.

3. Documents sufficient to show the financial condition of the Company before and after the Up-Tiering, including balance sheets, income statements, cash flow reports and liquidity projections.

5626-1589771955-448



**Expropriation**

*Unless otherwise specified in an individual request, the Expropriation related requests seek documents created, sent or received during the period 1 February 2025 through present.*

4. All documents and communications concerning Luxco 1 and Luxco 2, including documents relating to:

    a. The engagement by Holdco, Midco and/or Hunkemöller of Vistra Luxembourg;

    b. The incorporation of Luxco 1 and Luxco 2;

    c. The engagement by Luxco 1 of the Luxco 1 directors and the engagement by Luxco 2 of the Luxco 2 directors;

    d. The insertion of a double Luxco structure into the Group's (as defined in the ICA) corporate structure;

    e. The Luxco 2 Share Pledge agreement;

    f. Luxco 1 and Luxco 2's legal and economic ownership structure including the full names and addresses of its ultimate beneficial owner(s);

    g. The sale and purchase agreement and any deed of transfer pursuant to which the shares in Luxco 1 were transferred to Holdco;

    h. The sale and purchase agreement and any deed of transfer pursuant to which the shares in Midco were transferred to Luxco 1;

    i. The sale and purchase agreement and any deed of transfer pursuant to which the shares in Midco were transferred to Luxco 2;

    j. Luxco 1's acquisition of the shares of Luxco 2;

    k. Documents reflecting the position of Luxco 1 and Luxco 2 immediately prior to the Expropriation described in the letter dated 21 March 2025 from counsel for the Company; and

5. All documents and communications concerning the AHG's attempts (directly or through advisors) to engage with the Group as regards their participation in solutions for the Group's liquidity constraints.

7

5626-15897711955-448



6. All documents and communications concerning the purported event of default that occurred on or around 21 March 2025 or, if it occurred prior to that date, details of why it was decided that other parties should not be notified of such event of default until after the completion of the Expropriation on 21 March 2025 (end of day).

7. All documents and communications concerning the Instructing Group (as defined in the ICA), including Documents relating to:

    a. The names and holdings of each member(s) of the Super Majority Super Senior Creditors (as defined in the ICA);

    b. The names and holdings of each member(s) of the Majority Senior Secured Creditors (as defined in the ICA); and

    c. The Instructing Group's instructions to the Security Agent with respect to the enforcement of the Luxco 2 Share Pledge and any other transaction that is part of the Expropriation.

8. All documents and communications considering the notification and consultation requirements in the ICA (including under Clause 16.4(a), Clause 16.4(b) and Clause 16.4(d)) and the decision not to notify/consult with Parties other than the Instructing Group (as defined in the ICA).

9. All documents and communications concerning the timing and value of the purported enforcement of the Luxco 2 Share Pledge and the Liabilities Disposal, including Documents relating to:

    a. The decision and reasoning of the directors of the relevant companies that the purported enforcement of the Luxco 2 Share Pledge and the Liabilities Disposal maximized the recovery by the Super Senior Creditors, the Senior Secured Notes Creditors and the Future *Pari Passu* Creditors (as defined in the ICA);

    b. The decision and reasoning of the Instructing Group that the timeframe and manner of the purported enforcement of the Luxco 2 Share Pledge, and for any instructions given regarding the Liabilities Disposal, was consistent with the Security Enforcement Objective (as defined in the ICA);

8

c.      The decision and reasoning that the purported enforcement of the Luxco 2 Share Pledge and the Liabilities Disposal should proceed on the basis of a Financial Advisor's Opinion (as defined in the ICA) rather than other forms of valuation/process.

d.      The opinion of Grant Thornton UK LLP ("**Grant Thornton**", and the opinion, the "**Grant Thornton Opinion**") in relation to the purported enforcement of the Luxco 2 Share Pledge and the Liabilities Disposal;

e.      The information provided to Grant Thornton regarding the purported enforcement of the Luxco 2 Share Pledge and related Liabilities Disposal;

f.      The determination of the directors of the relevant companies, and of Grant Thornton, that the appointment of Grant Thornton as Financial Advisor did not raise any conflicts of interest;

g.      The timing and terms of engagement of Grant Thornton by the Group or any member of it (whether relevant to Grant Thornton Opinion or otherwise);

h.      The decisions and reasonings of: (i) the directors of the relevant companies; and (ii) Grant Thornton, respectively, not to conduct market testing with respect to the valuation of the Group and its business, including by any engagement with the AHG given their previous indication of their willingness to participate in/facilitate potential solutions for the Group's liquidity constraints;

i.      The decisions and reasonings of: (i) the directors of the relevant companies; and (ii) Grant Thornton, respectively, to be satisfied that purchases by Redwood of participations in the super senior RCF Agreement (as defined in the ICA) and the Senior Secured Bridge Facilities Agreement (as defined in the ICA) in February 2025 were "arms' length transactions [that] corroborate[d] the valuation conclusions reached by the Financial Advisor";



  j. Redwood's purchase of participations in the super senior RCF Agreement and the Senior Secured Bridge Facilities Agreement in February 2025 (including full details of the date, price, terms, counterparty and principal amount of the transactions);

  k. The "deliberations" of the Companies' management team that were "informed" by the valuations and the transactions entered into by Redwood in February 2025.

  l. The decision not to notify Creditors (as defined in the ICA) that are not part of the Instructing Group that would have allowed such Creditors to object to the proposed enforcement of the Luxco 2 Share Pledge (as anticipated in paragraph 9 of the Security Enforcement Principles (at Schedule 5 of the ICA); and

  m. Any Objection (as defined in the ICA) that was received pursuant to paragraph 9 of the Security Enforcement Principles and details of consideration of any such Objection (as required by paragraph 10 of the Security Enforcement Principles).

10. Documents and communications concerning the requirements of the Luxco 2 Share Pledge with respect to the determination of market value of the shares of Luxco 2 for the purposes of any enforcement.

11. Documents and communications concerning any determination that the best price reasonably obtainable having regard to the prevailing market conditions was obtained, for the shares in Luxco 2 and the Liabilities subject to the Liabilities Disposal.

12. Documents and communications concerning the delegation agreement with Purple Iris under which Purple Iris was designated, appointed and authorized as entity entitled to appropriate the shares of Luxco 2.

13. Documents and communications concerning the enforcement and appropriation of Luxco 2's shares, including Documents relating to:



      a.     The notice notifying Luxco 1 of the appropriation of the shares of Luxco 2 and instructing Vistra (Luxembourg) S.à r.l. to update the Luxco 2 shareholder register to record Purple Iris as the sole shareholder of Luxco 2;

      b.     Documents and communications concerning the decision and reasoning as to why appropriation was deemed an appropriate method of purported enforcement;

      c.     The current Luxco 2 shareholder register; and

      d.     Documents and communications concerning how the appropriation complied with the requirements of Directive 2002/47/EC of June 6, 2022 on Financial Collateral Arrangements, as transposed into Luxembourg law by way of the Law of 5 August 2005 on Financial Collateral Arrangements.

14. Documents and communications concerning the Liabilities Disposal, including Documents relating to:

      a.     The principal amount and valuation for each applicable sub-category of Liabilities (as defined in the ICA).

      b.     The decision and reasoning as to why an offer of EUR86,700,000 was: (a) offered; and (b) accepted for those Liabilities.

      c.     Full details of the allocation of the price referred to immediately above to the applicable sub-categories of Liabilities, including the €1,700,000 that the Company's 21 March 2025 letter states would be allocated to the Senior Secured Notes Liabilities.

      d.     The terms on which Redwood's Notes were redeemed and/or cancelled.

15. Key documents concerning Purple Iris, such as its' constitutional documents, documents relating to the appointment of board members, legal and beneficial ownership, the identity of any person(s) having control over Purple Iris (including any AML/KYC documents), and any partnership, board and/or committee resolutions (or similar).

16. All documents and communications concerning any (i) restructuring or other steps with respect to Purple Iris and any of its affiliated



12

entities affecting the liabilities transferred in the Liabilities Disposal and (ii) purported or planned cancellation and/or delisting of the Notes.

17. All documents and communications concerning any indemnity agreements executed in connection with or implicated by the Up-Tiering or Expropriation.

18. All documents and communications concerning any Directors & Officers insurance held by the Companies or the Directors, or any other insurance arrangements executed in connection with or implicated by the Up-Tiering or Expropriation.